The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
August 6, 2026

## 2026 COA 63

**No. 24CA0007, *People v. Fonseca* — Crimes — Domestic Violence — Intimate Relationship**

In this criminal appeal, the defendant challenges the sufficiency of the evidence to support his conviction for third degree assault as an act of domestic violence, on the ground that he and the victim, who had recently started seeing each other, were not in an "intimate relationship" for purposes of section 18-6-800.3(1)-(2), C.R.S. 2025. Applying the factors set forth in *People v. Disher*, 224 P.3d 254, 258 (Colo. 2010), a division of the court of appeals concludes that neither the relatively short duration of the relationship nor the parties' own characterizations of it are dispositive of whether the defendant and the victim were in an intimate relationship; instead, determining the nature of the

relationship entails an objective, fact-intensive inquiry that turns on the totality of the evidence.

Because the division concludes that a reasonable jury could have found that the defendant and the victim were in an intimate relationship and rejects the defendant's other contentions of error, it affirms the defendant's conviction.

COLORADO COURT OF APPEALS                                    **2026 COA 63**

Court of Appeals No. 24CA0007
Adams County District Court No. 23CR290
Honorable Kyle Seedorf, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Yasniel Fonseca, Jr.,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE HARRIS
Tow, C.J., and Brown, J., concur

Announced August 6, 2026

Philip J. Weiser, Attorney General, Jaycey DeHoyos, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Daniel J. Sequeira, Deputy
State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     After the victim reported to police that defendant, Yasniel Fonseca, Jr., punched her in the face and pointed a gun at her, the People charged Fonseca with third degree assault as an act of domestic violence and felony menacing.  A jury found Fonseca guilty of the assault charge but acquitted him of menacing.

¶ 2     On appeal, Fonseca contends that the evidence was insufficient to support his conviction and that the prosecutor committed reversible misconduct.  In addressing Fonseca's sufficiency challenge, we hold that whether the defendant and the victim were in an intimate relationship for purposes of a domestic violence finding entails an objective, fact-intensive inquiry that depends on the totality of the evidence.  Neither the brief duration of the relationship nor the parties' informal characterizations of it preclude a finding of an intimate relationship as a matter of law.

¶ 3     On this record, we conclude that a reasonable jury could have found that Fonseca and the victim were in an intimate relationship. And because we reject Fonseca's other contentions of error, we affirm.

## I.     Sufficiency of the Evidence

¶ 4     Fonseca does not dispute that he struck the victim.  But he contends that the prosecution failed to prove that the victim suffered bodily injury or that the assault was an act of domestic violence.

### A.     Standard of Review

¶ 5     On a challenge to the sufficiency of the evidence, we review the record de novo to determine whether the evidence, both direct and circumstantial, is sufficient to support a conclusion by a reasonable jury that the defendant is guilty beyond a reasonable doubt. *Johnson v. People*, 2023 CO 7, ¶ 13.  In doing so, we view the evidence in the light most favorable to the verdict and give the prosecution the benefit of every reasonable inference that may fairly be drawn from the evidence.  *People v. Donald*, 2020 CO 24, ¶¶ 18-19.

### B.     Bodily Injury

¶ 6     A person commits third degree assault when he "knowingly or recklessly causes bodily injury to another person."  § 18-3-204(1)(a), C.R.S. 2025.  "Bodily injury" means physical pain, illness, or any

impairment of physical or mental condition. § 18-1-901(3)(c), C.R.S. 2025.

¶ 7     At trial, the victim testified that the assault occurred after she checked the notifications on Fonseca's phone and discovered that he was in contact with other women. An argument ensued, drawing the attention of Fonseca's brother, who entered the room and insulted the victim. The victim asked the brother to leave, a request Fonseca found disrespectful, and he slapped the victim across the face. When the victim tried to slap him back, Fonseca punched her in the face multiple times.

¶ 8     The victim testified that "the[] strikes hurt" and caused bruising and swelling on her face. And when she put her hands up to protect her face, the punches "hit [her] knuckles" and hurt her hands. The force of the blows also "popp[ed] off" some of her acrylic nails, causing pain.

¶ 9     Contrary to Fonseca's argument on appeal, the fact that his testimony contradicted the victim's version of events did not render the evidence of bodily injury insufficient. It merely created a conflict in the evidence, which the jury resolved in the victim's favor. *See People v. Moya*, 899 P.2d 212, 218 (Colo. App. 1994)

("[E]vidence is not rendered insufficient by conflicting accounts as to what happened . . . ."); *People v. Newell*, 2017 COA 27, ¶ 28 ("It is for the jury . . . to decide which witnesses and even which version of the witnesses' testimony is to be believed."). We may not substitute our judgment for that of the jury and reweigh the evidence or the credibility of the witnesses. *People v. Poe*, 2012 COA 166, ¶ 14.

¶ 10   Also irrelevant is the lack of any documentary or other corroborating evidence of an injury. True, as Fonseca points out, the officer who interviewed the victim after the assault did not observe any physical injuries on the victim or in the photographs the officer took of her. But visible injury is not an element of third degree assault. To support a finding of bodily injury, the prosecution need only prove "some physical pain . . . or . . . impairment, however slight." *People v. Hines*, 572 P.2d 467, 470 (Colo. 1977); *accord People v. Black*, 2020 COA 136, ¶¶ 36-39 (testimony that the defendant scratched the officer's arms and that it "caused him pain" was sufficient to sustain third degree assault conviction even though photos of the injury showed only "faint marks"). The victim's testimony was therefore sufficient to support the jury's bodily injury finding.

¶ 11    Finally, we reject Fonseca's cursory assertion that the split verdict or the jury's question about "the severity of 3rd degree assault versus . . . 1st [or] 2nd" somehow bears on the sufficiency analysis. Fonseca provides little explanation for the assertion, and we fail to see the connection.

## C.    Act of Domestic Violence

¶ 12    Under Colorado law, domestic violence is not an independent crime. *People v. Disher*, 224 P.3d 254, 256 (Colo. 2010). Rather, a finding that the charged crime was committed as an act of domestic violence requires the court to impose treatment in addition to any sentence the defendant receives. *Id.*; § 18-6-801(1)(a), C.R.S. 2025. Domestic violence is defined as "an act or threatened act of violence upon a person with whom the actor is or has been involved in an intimate relationship." § 18-6-800.3(1), C.R.S. 2025.

¶ 13    Fonseca argues that the evidence was insufficient to establish that he and the victim were in an intimate relationship.

¶ 14    Whether the parties were involved in a sufficiently close relationship is a fact-intensive inquiry "not susceptible to resolution based on shorthand labels or descriptors." *M.A. v. B.F.*, 317 Cal. Rptr. 3d 909, 911 (Ct. App. 2024). As a general matter, to qualify

5

as "intimate," the relationship must be more than that of a roommate, friend, or acquaintance; there must be a "romantic attachment" between the parties. *Disher*, 224 P.3d at 258; *see also* § 18-6-800.3(2) (an "intimate relationship" can include a relationship between unmarried people). The supreme court has identified certain factors to guide the inquiry: (1) the duration of the relationship; (2) the nature or type of the relationship; and (3) the frequency of interaction between the parties. *Disher*, 224 P.3d at 258. These factors are nonexhaustive and can be used "in whole or in part." *Id.*

¶ 15 The victim testified that she and Fonseca met over social media, after which they began to "hang out . . . in person." Over the course of about three weeks, they saw each other three or four times, and on one of those occasions, they had sex. Fonseca and the victim visited each other's homes, and the night before the assault, the victim spent the night at Fonseca's house.

¶ 16 Although neither the victim nor Fonseca characterized their relationship as "dating," the victim testified that they were "talking in anticipation of maybe dating," "on the verge of kind of maybe becoming something," and "definitely romantic." She said that

Fonseca had told her they were "locked in," meaning that they were "exclusive at the time." And while Fonseca denied having said they were "locked in," he acknowledged that their relationship "wasn't just about meeting up to have sex," and that the two were "getting to know each other."

¶ 17 The night before the incident, Fonseca and the victim "h[u]ng out," and the victim testified that they "fell asleep cuddling." In the morning, when the victim saw notifications from other women on Fonseca's phone, she was "annoyed" and "upset" because she believed Fonseca had lied to her about being "locked in." Still, Fonseca let her look through his phone and delete most of the offending contacts, so she was temporarily appeased.

¶ 18 We cannot say that, as a matter of law, this evidence was insufficient to support a finding of an intimate relationship.

¶ 19 We disagree with Fonseca that the duration of the relationship (three weeks of in-person contact) and the frequency of interactions (four over three weeks) preclude a finding of an intimate relationship. Neither the relationship's duration nor the frequency of contacts is dispositive. *See Disher*, 224 P.3d at 258 (evidence was sufficient to support court's finding of an intimate relationship

even though there was no evidence of the relationship's duration or frequency of the parties' interactions); *cf. Thomas v. Williams*, 773 S.E.2d 900, 904 (N.C. Ct. App. 2015) (affirming a finding that the parties were in a "dating relationship" despite the fact that they had been seeing each other for less than three weeks);[1] *People v. Rucker*, 25 Cal. Rptr. 3d 62, 69 (Ct. App. 2005) (holding that a "relatively

---

[1] Most state domestic violence statutes use the term "dating relationship" rather than "intimate relationship." *See, e.g.*, Cal. Fam. Code § 6211 (West 2025) (defining "domestic violence" as abuse perpetrated against, among other categories of persons, a "person with whom the respondent is having or has had a dating or engagement relationship"); N.J. Stat. Ann. § 2C:25-19(d) (West 2025) ("victim of domestic violence" includes any person who has been subjected to domestic violence by a person with whom the victim has a "dating relationship"); N.C. Gen. Stat. § 50B-1 (2025) (domestic violence statute applies where the parties are in or have been in a "dating relationship"). In these statutes, "dating relationship" generally has the same meaning as "intimate relationship" under Colorado law. *See, e.g.*, Cal. Fam. Code § 6210 (West 2025) ("Dating relationship" means "frequent, intimate associations primarily characterized by the expectation of affection or sexual involvement independent of financial considerations."); *Andrews v. Rutherford*, 832 A.2d 379, 383-84 (N.J. Super. Ct. Ch. Div. 2003) (whether "dating relationship" exists turns on consideration of factors including duration and nature of relationship and frequency of parties' interactions); N.C. Gen. Stat. § 50B-1(b)(6) (A "dating relationship" is a relationship in which the parties "are romantically involved over time and on a continuous basis during the course of the relationship. A casual acquaintance or ordinary fraternization between persons in a business or social context is not a dating relationship.").

new" relationship could still qualify as a "dating relationship"); *State v. Enos*, 21 A.3d 326, 331 (R.I. 2011) ("specific findings about the precise number of times two people saw each other" are not required "before reaching a conclusion that the parties are in a substantive dating relationship"); *M.A.*, 317 Cal. Rptr. 3d at 917 (three interactions within six or seven weeks that involved kissing or sexual activity could indicate a dating relationship).

¶ 20    Moreover, according to the victim, the parties' relationship ended after three weeks because of Fonseca's violence. Under Fonseca's logic, perpetrators who assault their intimate partners early in the relationship, and thereby end it during its initial stage, would not be subject to the domestic violence statute, no matter how often the cycle repeats itself. We do not think the legislature intended this illogical result. *See Pellegrin v. People*, 2023 CO 37, ¶ 22 (in interpreting a statute, courts should avoid constructions that lead to illogical or absurd results).

¶ 21    Likewise, the fact that the parties themselves said they were not boyfriend and girlfriend, a "couple," or dating exclusively does not control the sufficiency analysis. The fact finder is not required

9

to accept either party's characterization of the relationship. *See Phillips v. Campbell*, 206 Cal. Rptr. 3d 492, 498 (Ct. App. 2016).

¶ 22    For one thing, the concept of dating, and the jargon used to describe it, changes from one generation to the next. *C.C. v. J.A.H.*, 232 A.3d 505, 514 (N.J. Super. Ct. App. Div. 2020). When asked to describe the relationship, the victim said that she and Fonseca were "talking." Nonetheless, the relationship involved sex, *see Disher*, 224 P.3d at 258 (a sexual relationship may be an indicator of an intimate relationship), and overnight stays, *see Andrews v. Rutherford*, 832 A.2d 379, 385 (N.J. Super. Ct. Ch. Div. 2003) (evidence that the parties had "stayed together overnight on occasion" supported a finding of a dating relationship). The victim also spent time at the home Fonseca shared with his family and sometimes "h[u]ng out" with his sister. *See Andrews*, 832 A.2d at 385 (finding a dating relationship and noting that the parties had visited one party's family home on several occasions). And as the People point out, the argument that ultimately led to the domestic violence incident arose from the victim's jealousy over Fonseca's contact with other women. *See Brand v. State*, 960 So. 2d 748, 756 (Ala. Crim. App. 2006) (Shaw, J., dissenting) (Jealousy is "strong

evidence indicative of some kind of relationship beyond that of mere casual fraternization.").

¶ 23    In addition, if the court simply deferred to the parties' labels for the relationship, the purpose of the domestic violence statute might be undermined.  After the fact, the perpetrator could minimize the nature of the relationship, characterizing it as a mere acquaintanceship or friendship.  A victim fearing retaliation might do the same.  For this reason, whether the parties' relationship constitutes an intimate relationship for purposes of the statute must turn on objective criteria.  *See People v. McFadden*, No. C096562, 2024 WL 2808639, at *6 & n.4 (Cal. Ct. App. June 3, 2024) (unpublished opinion) (whether parties were in a "dating relationship" is an "objective inquiry" and can be based "largely on inferences"; the prosecution is not required to prove "that [the] defendant subjectively believed he was in a dating relationship").

¶ 24    To the extent Fonseca contends that because the parties mostly "hung out" and watched movies, the prosecution failed to prove an intimate relationship, we reject that contention.  No case appears to support the position that parties are in an intimate relationship only if they engage in what might be considered

11

traditional dating activities like going to restaurants or movie theaters. *See Hobdy v. State*, 919 So. 2d 318, 325 (Ala. Crim. App. 2005) (parties were in a dating relationship even though they "did not outwardly affirm their relationship by going out to movies, dinner, or other social gatherings").

¶ 25     The evidence of an intimate relationship between Fonseca and the victim was not overwhelming. But a rational jury could have found that there was a "romantic attachment" between them, and that the nature and duration of their relationship, as well as the frequency of their interactions, were sufficient to demonstrate an intimate relationship. And even assuming that a reasonable jury could have reached the opposite conclusion — which is essentially what Fonseca's argument boils down to — "[w]here reasonable minds could differ, the evidence is sufficient to sustain a conviction." *People v. Carlson*, 72 P.3d 411, 416 (Colo. App. 2003).

## II.     Prosecutorial Misconduct

¶ 26     Fonseca next argues that the prosecutor committed misconduct during closing argument by misstating the evidence, improperly vouching for the victim's credibility, and making arguments calculated to inflame the passion of the jury.

12

¶ 27   We review claims of prosecutorial misconduct using a two-step

analysis. *People v. Robinson*, 2019 CO 102, ¶ 18. First, we

determine whether the prosecutor's conduct was improper under

the totality of the circumstances. *Id.* Second, if we conclude that

the conduct was improper, we must decide whether reversal is

warranted under the applicable standard. *Id.*

¶ 28   Fonseca did not object to any of the alleged misconduct, so we

review for plain error. *People v. Vergari*, 2022 COA 95, ¶ 31.

Prosecutorial misconduct warrants reversal under the plain error

standard only when it is "flagrantly, glaringly, or tremendously

improper." *Id.* (citation omitted).

A.   Misstatement of Evidence

¶ 29   During the initial closing argument, the prosecutor told the

jury,

> Now, it's 2023, right, there's a lot of different
> labels people put on relationships and it's not
> always as clear as it might used to have been.
> And both [Fonseca and the victim] said, well,
> we didn't call each other boyfriend or
> girlfriend, we weren't officially dating. But
> what was the testimony? [The victim] said that
> [Fonseca] had told her they were locked in;
> that they had sex before; that their
> relationship wasn't just a friends with benefit
> thing, they also hung out, watched movies.

13

> She gave him a ride to work. They were getting to know each other. Sometimes they would hang out and just talk. This is a couple who is dating. *This is an intimate relationship in the eyes of the law.*

(Emphasis added.)

¶ 30 Then, in rebuttal, the prosecutor argued that an intimate relationship can be inferred

> when a couple who has had sex is hanging out, getting to know each other, describes it on the cusp of dating, and the very nature of the argument that both sides testified to dealt with jealousy because of exclusivity. All of those facts when looking in the totality show that this was an intimate relationship, this act was a domestic violence.

¶ 31 Fonseca says that the first argument improperly invited the jury to adopt the prosecution's legal conclusion concerning the nature of the relationship, and the rebuttal argument misstated the evidence. We discern no error.

¶ 32 The prosecutor's argument did not "impute" a "legal definition" of an "unmarried couple" "into the jury instructions," as Fonseca contends. The prosecutor recounted the evidence, including that neither party said they were "officially dating," and argued that the facts adduced at trial permitted the inference that they were in an

14

intimate relationship, a term in the jury instructions. A prosecutor's closing argument "may properly include the facts in evidence and the reasonable inferences drawn from those facts, as well as the law on which the jury has been instructed." *People v. Buckner*, 2022 COA 14, ¶ 18.

¶ 33     The rebuttal closing argument did not misstate trial testimony. The prosecutor's statement that both Fonseca and the victim described the relationship as "on the cusp of dating" was supported by Fonseca's testimony that they were "hanging out" and "getting to know each other" and the victim's testimony that they were "on the verge of . . . becoming something." And contrary to Fonseca's argument on appeal, the prosecutor did not say that Fonseca was jealous; she said that the parties' argument arose from jealousy, which was a reasonable inference to draw from the victim's testimony.

### B.     Improper Vouching

¶ 34     The prosecutor also argued that

> [the] defense is probably going to get up . . .
> and try to convince you that [the victim] is the
> one making this up; that this was a jealous
> outburst; that this is not a case about
> domestic violence . . . .

15

But while you're listening to that, I want you to ask yourself, is that what you saw as the witness testified today? As [the victim] sat up there emotional, reliving one of the most traumatic things that's happened to her, crying but staying consistent, and keeping her cool on cross-examination. Does that seem like she is making this all up? She is the consistent link. Her story hasn't changed. *She is telling the truth.*

(Emphasis added.)

¶ 35     She repeated in rebuttal closing that the victim was "telling the truth."

¶ 36     Fonseca argues that the prosecutor committed reversible misconduct by improperly expressing a personal opinion as to the veracity of the victim and vouching for her credibility. We disagree.

¶ 37     While "a prosecutor cannot communicate her opinion on the truth or falsity of witness testimony during final argument," a prosecutor may "properly argue from reasonable inferences anchored in the facts in evidence about the truthfulness of a witness' testimony." *Domingo-Gomez v. People*, 125 P.3d 1043, 1049, 1051 (Colo. 2005). Thus, a trial court does not plainly err by not sua sponte striking a prosecutor's assertion that a witness was "telling the truth" because "[t]he context in which the prosecutor

16

used the potentially problematic words 'truth' and 'truthful'" can reveal whether "the prosecutor was drawing reasonable inferences from the evidence rather than professing her personal opinion as to [the witness's] veracity." *People v. Wilson*, 2014 COA 114, ¶ 55.

¶ 38    Here, while the prosecutor said that the victim "was telling the truth," the larger context of the argument indicates that the prosecutor was drawing on the consistency of the victim's narrative before and during trial to argue that her story was reliable. *See Domingo-Gomez*, 125 P.3d at 1051 (a reviewing court may consider "the context in which [a challenged] statement was made" to determine if it is improper); *People in Interest of T.C.C.*, 2017 COA 138, ¶¶ 4, 9-10 (no error where prosecutor said that victim "ha[d] no reason to make up that he got struck numerous times [by defendant]" because her statement was corroborated by evidence at trial). And given that Fonseca's theory of defense depended on his claim that the victim fabricated the assault, this argument was a fair response to defense counsel's closing argument. *See People v. Iversen*, 2013 COA 40, ¶ 37 ("[A] prosecutor has considerable latitude in replying to opposing counsel's argument.").

¶ 39    Even assuming the brief references to "truth" were improper, they do not amount to plain error.  *See Wilson*, ¶¶ 51, 56-57 (no plain error where prosecutor's statements that a witness "told . . . the truth" and gave "core truthful details" merely drew inferences from trial evidence, the comments were not a major part of the argument, and the court gave a general credibility instruction).

C.    Argument Calculated to Inflame the Passion of the Jury

¶ 40    The prosecutor asked the jury to "find [Fonseca] guilty of menacing and assault in the third degree, both [as] acts of domestic violence," and to "hold him accountable for what he did to [the victim] that day" because "what happened to [the victim] mattered." She also argued that he should not "get to slap and hit girls that he's dating and point a gun at them and get away with it."

¶ 41    Fonseca says that these statements wrongly encouraged the jury to convict him in order to do justice for a sympathetic victim and protect community values.

¶ 42    True, "[a] prosecutor should not use arguments calculated to inflame the passion or prejudices of the jury." *People v. Clemons*, 89 P.3d 479, 483 (Colo. App. 2003).  And urging a jury to convict a defendant to do justice for a sympathetic victim or to protect

community values is improper. *People v. Conyac*, 2014 COA 8M,

¶ 147; *People v. Ortega*, 2015 COA 38, ¶ 54.

¶ 43     But in context, we understand the prosecutor's comments as

rhetoric meant to convey that the prosecution had met its burden of

proof with respect to both charges and, therefore, the jury should

return guilty verdicts. *See People v. Merchant*, 983 P.2d 108, 115

(Colo. App. 1999) (not misconduct for prosecutor to argue "I think

the evidence is clear that [the defendant] is guilty, and I'd ask you

to return . . . with that verdict"). In other words, the prosecutor's

argument was simply that Fonseca should be accountable for his

criminal conduct. The comment did not suggest that a guilty

verdict was necessary to do justice for an especially vulnerable or

sympathetic victim or to protect the community's values.

¶ 44     Regardless, any error was surely not plain. The brief

comments did not so undermine the fundamental fairness of the

trial as to cast serious doubt on the reliability of the verdict. *People

v. Ujaama*, 2012 COA 36, ¶ 74.

### III.    Cumulative Error

¶ 45     To the extent Fonseca raises a cognizable cumulative error

claim, we reject it. "For reversal to occur based on cumulative

error, a reviewing court must identify multiple errors that collectively prejudice[d]" the defendant's substantial rights. *Howard-Walker v. People*, 2019 CO 69, ¶ 25. Even assuming some impropriety in the prosecutor's closing argument, we discern no "cumulative prejudice" that affected Fonseca's substantial rights. *Id.*

## IV. Disposition

The judgment of conviction is affirmed.

CHIEF JUDGE TOW and JUDGE BROWN concur.